IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAG-DALY CITY, LLC,

    Plaintiff,

v.

QUALITY AUTO LOCATORS, INC., et al.,

    Defendants.

No. C 12-03907 WHA

**ORDER DENYING MOTIONS TO DISMISS**

## INTRODUCTION

In this dealership vehicle-allocation dispute, eight dealership defendants move to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction. One also moves to dismiss for lack of subject-matter jurisdiction and failure to state a claim for fraud. For the reasons explained below, these motions are **DENIED WITHOUT PREJUDICE**.

## STATEMENT

Plaintiff in this action is Pag-Daly City, LLC, dba City Toyota, located in California. Defendants are of two types: (1) car dealerships located outside of California; and (2) car broker companies and their employees. Car dealerships sell and service vehicles manufactured by Toyota. Car broker companies Quality Auto Locators and Classic Locators locate vehicles that have been allocated to dealers that have too much inventory and are willing to transfer those allocations to dealers who are short on inventory. Brokers facilitate that transfer and are paid a fee for the service.

An "A-status" vehicle is a vehicle that has been "allocated" by the manufacturer to a dealer and that the dealer has accepted to be part of its future stock (Moeller Dep. 37). At the time of allocation, the vehicle does not physically exist in the dealer's lot, but is electronically credited to its inventory. Dealers looking to "unload" this inventory will match up with dealers who need more inventory and transfer the A-status vehicles in yet another electronic transaction (Elder Dep. 44–45). Sometimes, brokers such as Quality Auto and Classic Locators facilitate these transactions.

Plaintiff City Toyota alleges that defendant dealers utilized defendant brokers to induce a City Toyota employee to make unauthorized transfers of A-status vehicles out of City Toyota's inventory and into the inventory of dealer defendants. The employee's name was Allan Mercado. According to plaintiff's allegations, Mercado presented to the brokers, Quality Auto Locators and Classic Locators, that he had an "in" with California dealers from which he could provide "A-status" vehicles (Petro Dep. 45). Quality and Classic would locate buyers, and the transfers would be made. Eventually, plaintiff realized Mercado had made over 350 unauthorized transfers of A-status vehicles out of its inventory and into the inventories of dealers across the country (Amd. Compl., Exh. A). Plaintiff did not receive the vehicles that it was allocated, nor did it receive any payment for the transfer of the A-status vehicles from its dealership (Compl. ¶ 21).

During the time of these unauthorized transfers, plaintiff alleges that the industry had "critical supply and inventory shortfalls" (Compl. ¶ 28). These shortfalls were primarily caused by the economic downturn in 2008, the "Cash-for-Clunkers" program in 2009, and, more specifically with respect to Toyota cars, the earthquake and tsunami that struck Japan in March 2011 (*id.* at ¶¶ 23–26).

In January 2013, the car dealership defendants, each located outside of California, moved to dismiss for lack of personal jurisdiction. A January 2013 order found that the record was inadequate to rule on the motion, and allowed further discovery. The order held that "[i]f the dealership defendants indeed knew that they were participating in the improper transfer of vehicles bound for California, or at least acted recklessly, then the exercise of specific personal

1 jurisdiction over these defendants may be proper" (Dkt. No. 152 at 3). After discovery, both
2 sides submitted supplemental briefing.

3 Because it will be applicable with respect to each defendant, this order will briefly set
4 forth the process under which the brokered A-status vehicle transfers were typically conducted.
5 Four defendants used the broker services of Quality Auto Locators, Inc. and its owner Chad
6 Petro, co-defendants in this action. Five defendants used the broker services of Christopher
7 "Steve" Glass at Classic Locators, not named in this action. One defendant used both brokers'
8 services.

9 Chad Petro of Quality Auto Locators testified to the standard procedure that his company
10 followed in executing the "dealer transfer form," which was the contract used to transfer an A-
11 status car. Quality Auto's practice was to keep the parties "held separate" until both sides agreed
12 to the transaction. Quality Auto would send one form to the buyer to fill out, with the seller
13 information filled in as "to be provided." It would then send one form to the seller to fill out,
14 with the buyer information listed as "to be provided." When both were signed and returned,
15 Quality Auto would do a "cut and paste," and create a form with both the seller and buyer
16 information and signatures. Quality Auto then provided a copy of the signed form to both sides
17 (Petro Dep. 122, 126). Once the buying dealer confirmed that it had received the car(s) in its
18 inventory, the buyer would write a check and deliver the entire amount to broker Quality Auto,
19 *not* to the dealer (Petro Dep. 127). Plaintiff alleges that it received no payments from these re-
20 allocations (Compl. ¶ 21).

21 Mr. Steve Glass of Classic Locators provided testimony that revealed a process that was
22 less systematic but of similar character. According to his testimony, the process would begin by
23 sending out Classic's version of a dealer transfer form to be signed by the buyer. The seller
24 would then transfer the vehicles into the buyer's inventory. Next, the buying dealer would check
25 its inventory. If the transfers had arrived, the buyer would then write a single check, made out to
26 Classic Locators (Glass Dep. 132, 181). This was despite the fact that the form Classic used
27 explicitly indicated that the buying dealer should "contact selling dealership to make payment
28

3

1  arrangements" (Glass Dep. 77). Plaintiff alleges that it received no payments from these
2  transfers (Compl. ¶ 21).

3        A common practice among buying dealers was to confirm that the A-status vehicles had
4  been transferred to their inventory before making a payment for the vehicles. It is also not
5  disputed that, as soon as vehicles were transferred into a dealer's inventory, a dealer had access
6  to all information regarding the transferring dealer through a system called Dealer Daily,
7  including the location of the transferring dealer (Moeller Decl. ¶ 5). At this point, a dealer
8  would have had a way to learn that City Toyota, a California dealership, was the source of its A-
9  status transfers. City Toyota had access to this information as well.

## ANALYSIS

Plaintiff argues only for specific personal jurisdiction. Our court of appeals has established a three-prong test under which we must analyze a claim of specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws;
>
> (2) The claim must be one which arises out of or relates to the defendant's forum-related activities;
>
> (3) The exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

The purposeful-availment or direction requirement of the first prong protects a defendant from being haled into a jurisdiction "merely because of random, fortuitous, or attenuated contacts . . . or because of the unilateral activity of a third party." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Jurisdiction is proper when the "contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum state." *Ibid.* (quotation omitted).

"[P]laintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger*, 374 F.3d at 800 (citation omitted). When "the trial court rule[s] on the issue

4

1    relying on affidavits and discovery materials without holding an evidentiary hearing, dismissal is
2    appropriate only if the plaintiff has not made a prima facie showing of personal jurisdiction."
3    *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). To determine
4    whether plaintiff has met the *prima facie* burden, "any evidentiary materials submitted on the
5    motion are construed in the light most favorable to the plaintiff and all doubts are resolved in
6    [plaintiff]'s favor." *Schwarzenegger*, 374 F.3d at 802.

7    When the issue of personal jurisdiction is argued in an evidentiary hearing, in a summary
8    judgment motion, or at trial, the burden on the plaintiff shifts to a preponderance of evidence.
9    *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 598 n.3 (9th Cir. 1993). At the Rule 12-stage, the
10   plaintiff must only make a *prima facie* showing, and this order will make reasonable assumptions
11   and resolve factual disputes in plaintiff's favor.

12   Under this standard, defendants' motions to dismiss are **DENIED WITHOUT PREJUDICE**.
13   Regarding the second and third prongs of the test for specific personal jurisdiction, plaintiff's
14   claims against all of the dealer defendants for conversion, unfair competition, and penal code
15   violations involving stolen property arise out of the alleged diversion of vehicles bound for
16   California. This order accordingly finds that the claims arise out of the defendants' forum-
17   related activities. This order also finds that it is reasonable for the defendants to be haled into a
18   California court for allegedly diverting vehicles that would otherwise have been sold by a
19   California dealer to consumers in California. Regarding the first prong, this order will now
20   assess each defendant in turn to decide whether plaintiff has established a *prima facie* case that
21   each dealer defendant "purposefully direct[ed] his activities or consummate[d] some transaction
22   with the forum or resident thereof."

23   **1.    BERT WOLFE, INC., DBA BERT WOLFE TOYOTA.**

24   This order finds that there is *prima facie* evidence that Bert Wolfe Toyota (BWTI)
25   repeatedly and knowingly consummated transactions that prevented cars from reaching the
26   inventory of our dealer plaintiff in California, and is therefore properly under this Court's
27   jurisdiction at this stage.

*First*, plaintiff has made a sufficient *prima facie* showing that at the time BWTI paid its broker, Quality Auto Locators, for the A-status vehicles, BWTI knew or should have known that the A-status vehicles were coming from California. All Toyota dealers had access to a program called Dealer Daily, where they checked their inventory. In this program, they could also check the identity and location of the transferring dealer. Joshua Zain, the sales manager at BWTI, testified that he checked it "daily" (Zain Dep. 89). In a typical A-status transfer at BWTI, the selling dealer would transfer the vehicles into BWTI's inventory, and BWTI would always check the inventory on Dealer Daily to verify (Zain Dep. 91–92). BWTI used Quality Auto six times in less than a year to acquire over 52 A-status vehicles (Amd. Compl., Exh. A). Construed favorably to plaintiff, this evidence shows that defendant repeatedly contracted to obtain cars that he knew or should have known were from California.

*Second*, defendant BWTI does not produce evidence that refutes this *prima facie* showing. Zain claims he does not recall if the transfers were "blind" or not at the time he signed the dealer transfer forms (Zain Dep. 83). In fact, "[d]ealer trades are the last minute thing on [his] mind" (Zain Dep. 139). BWTI only produced two incomplete dealer transfer forms for all six transactions when, according to both Zain and Petro's testimony, there was usually some documentation, at least by fax, for each transfer (Zain Dep. 83). Zain's total lack of recollection and BWTI's missing paperwork do not defeat the *prima facie* showing.

Construed favorably to plaintiff, the evidence shows that BWTI purposefully consummated transactions to the detriment of a company that it knew to be located in California. This order holds that in light of this repeat activity, personal jurisdiction in California is reasonable.

  **2. FAULKNER TREVOSE, INC., FKA FAULKNER TOYOTA, INC.**

This order finds that the record contains *prima facie* evidence that defendant Faulkner Trevose knowingly consummated a transaction diverting vehicles that were allocated to a California dealership and did so in reckless disregard of the potential impropriety of its activity. Jurisdiction is therefore properly asserted at this stage.

6

*First*, defendant Faulkner knew that the cars it was receiving were originally allocated to a California dealership. From March 15–16, 2011, defendant acquired 57 A-status vehicles from City Toyota through its broker, Classic Locators (Amd. Compl,. Exh. A). Upon the transfer, Mr. Harris, the sales manager for Faulkner, prepared a spreadsheet listing each car and its location-specific "dealer code." On Dealer Daily, a dealer could see the location of any dealership if it had that dealer's code (Dep. Exh. 49). On March 21, after checking to verify that the cars had been transferred to his inventory, Mr. Harris prepared a check request for Classic Locators. In that check request, Harris specified the reason for the disbursement: "Had 41 vehicles flipped into our inventory from California" (Dep. Exh. 42 at 4). While the parties dispute whether the transaction was properly considered "completed" when the inventory transfer took place or when the payment was made, it is clear that defendant deliberately made a payment for cars that it knew it would be removing from a California dealership.

In addition to knowingly consummating a transaction that it knew would remove product from a California dealer, plaintiff has submitted *prima facie* evidence that Faulkner Toyota acted in reckless disregard of the potential impropriety of the transaction. Faulkner obtained these A-status transfers days after the March 2011 tsunami in Japan, after getting word that it should expect "the inventory to drastically reduce" (Harris Dep. at 78). Harris testified that he gave no thought to the fact that this would reduce inventory in California as well but, when pressed, affirmed that it may have been "too good to be true" (Harris Dep. at 82). Defendant confirms that he knew nothing about this broker, Classic Locators, who just happened to cold-call one day (Harris Dep. 66). Given that this was a large, one-time, "too good to be true" deal, defendant may not hide from jurisdiction because he recklessly did not give "any thought" to the source (Harris Dep. 68).

### 3. PAGE IMPORTS, INC., DBA PAGE TOYOTA.

There is also *prima facie* evidence that Page Toyota acted with both knowledge that it was diverting cars that were intended for California, and with reckless disregard to the potential impropriety of its activity.

7

Like other dealers, defendant Page Toyota was informed of the California origin of the vehicles at the time it completed the transaction. Michael Gardner, the general manager at Page, checked Dealer Daily when transfers were made, from which he could have known the origin of the cars. Moreover, Gardner testified that as he would receive the inventory, he would customarily generate vehicle information reports for the accounting department, from which he testified that he could see that the cars were coming from City Toyota (Gardner Dep. 67–68). Therefore, there is *prima facie* evidence that defendant Page knowingly consummated transactions in which it re-allocated vehicles it knew or should have known were originally destined for California.

Furthermore, in early 2011, Gardner was contacted by the general manager at Fremont Toyota, another California dealership, who informed him that unauthorized transfers had been made to Page Toyota from his dealership. The Fremont general manager indicated that "the vehicles were transferred to [Page's] inventory without his knowledge, that an employee had did it without his permission, [and] that [Fremont Toyota] wanted the vehicles back" (Gardner Dep. at. 76). Despite this warning, it does not appear that Gardner made any changes to his procedures with respect to A-status transfers. This order finds there is *prima facie* evidence to demonstrate that defendant acted in reckless disregard of the potential impropriety of these transfers from this point forward, as he continued to complete A-status transfers from City Toyota with little official paperwork (or at least little that has been produced in discovery).

**4. MULLER AUTOMOTIVE, INC., DBA LAWRENCE TOYOTA.**

This order finds that there is also *prima facie* evidence that Lawrence Toyota acted with knowledge that it was diverting cars that were intended for California, and with reckless disregard to the potential impropriety of its activity.

There is *prima facie* evidence that Defendant Lawrence Toyota knew the dealer from which it was getting the A-status vehicles was from California. As Mike Page, inventory control manager of Lawrence Toyota, testified, he was constantly aware of the time difference with this "West Coast" dealer in negotiations. Upon further questioning, it was made clear that Page was not aware of any cars Lawrence had received from any West Coast state but California (Page

8

Dep. 70–73). Plaintiffs allege that Lawrence then engaged in three sets of unauthorized transfers from June 2010 to August 2010 for a total of 54 A-status cars (Amd. Compl., Exh. A). After multiple transactions with the same party, defendant Lawrence Toyota knew or should have known, whether it checked the inventory or not, that the cars were originally allocated to California.

Prior to its unauthorized transfers, Lawrence Toyota executed an authorized A-status transfer with City Toyota in January 2010. In the authorized transfer, defendant's practices were substantially different. Defendant paid City Toyota directly for the vehicles. Mr. David Moeller, the chief financial officer and dealer principal of City Toyota, executed a signed seller's agreement, and Lawrence Toyota executed a signed buyer's agreement with the dealer, City Toyota, indicated at the bottom. This paperwork was typical, and it was retained and produced by the defendant (Dep. Exh. 32). In the following unauthorized transactions, there were no seller's agreements (or none have been produced), and the check went only to Classic Locators (Exh. 34, 35). This stark deviation from past practices demonstrates reckless disregard of the potential impropriety of this transaction.

### 5. WALKER AUTO GROUP, INC., DBA WALKER TOYOTA.

Walker Toyota has a long history of repeated transfers of A-status cars from City Toyota, from which it would be reasonable to infer that defendant Walker Toyota knew it was receiving cars from California when it used Classic Locators.

Plaintiff alleges that defendant Walker Toyota engaged in ten different sets of unauthorized transfers between January and November of 2010 for 78 A-status cars (Amd. Compl., Exh A). While defendant argues that the Court should not rely on Exhibit A, as its source has not been authenticated, it is alleged in the complaint, and at this stage, we must accept all allegations made in the complaint as true, particularly provided that defendant has submitted no evidence to refute it. Like other defendants, Walker had access to the dealership information on each and every one of the cars that was in its inventory. After repeated transfers, plaintiff has made a *prima facie* case that defendant knew or should have known that each time it used Classic Locators to find cars, the cars were originally allocated to California.

9

Defendant Walker Toyota also completed two authorized transactions with City Toyota. A comparison with the unauthorized transfers produces *prima facie* evidence that defendant acted in reckless disregard of the potential impropriety of the transaction. In the authorized transactions, City Toyota was identified as the "selling dealership," and its location was clearly displayed on the dealer transfer form. Despite testifying that "every single one of our deals" would have a completed transfer form, the final version of which would have "everything on it," Walker did not produce any such completed contracts for the allegedly unauthorized transactions (Walker Dep. 117, 239). For some transactions, defendant produced no accompanying paperwork. The forms defendant did produce did not have the seller information available. Walker produced incomplete forms, or no forms at all (*See* Dep. Exh. 3, 5). This deviation from standard procedure is enough for an inference of recklessness at this stage.

**6. CHARLES BARKER ENTERPRISES, INC., DBA CHARLES BARKER TOYOTA.**

Plaintiff alleges that Charles Barker Toyota engaged in the unauthorized transfer of 35 A-status vehicles from April 2010 through March 2011, using Steve Glass at Quality Auto Locators (Amd. Compl., Exh. A). Plaintiff makes a sufficient *prima facie* showing that defendant Charles Barker Toyota was aware that it was transacting to obtain cars that were originally allocated for California.

*First*, there is some evidence that defendant Charles Barker Toyota had contact with Allan Mercado, plaintiff's "miscreant" employee, while negotiating the first unauthorized transfers in April 2010. In the end of April 2010, plaintiff alleges that 26 unauthorized transfers were made to Charles Barker Toyota (Amd. Compl., Exh. A). Mercado's phone records indicate there was communication between Mercado and Charles Barker Toyota during this time (Logan Decl. ¶ 20, Exh. A). Charles Barker Toyota also previously had dealings in authorized transfers with City Toyota, in which it communicated with Mercado (Dep. Exh. 21–22). Construing this evidence most favorably to the plaintiff, defendant knew or had reason to know that the cars they were obtaining were coming not just from California, but from Mercado and City Toyota more specifically.

10

*Second*, defendant produced a fax that shows defendant was given the identifiable dealer code of City Toyota prior to the November 2010 A-status transfers. On this fax, Steve gave Mr. Carter a list of the available inventory, or suggested that he could "just look @ his Dealer Code which is 04143" to pick out the cars he wanted to transfer (Exh. 28 at 1). Defendant's process was not "blind." It was aware of the locations of the cars prior to when the transaction was consummated.

*Third*, Mr. Carter confirmed that he would, like other dealers, always check that the cars were in his inventory before writing a check for the cars (Carter Dep. 51). At this point, he would have had full access to information on the location of the selling dealer. Through the course of five separate transfers, defendant knew or should have known that these cars were likely being diverted from a California dealership.

With this showing, plaintiff has made a *prima facie* case that defendant purposefully and repeatedly transaction to obtain vehicles that it knew had been allocated to a California dealership.

### 7. PLE ENTERPRISES, INC., DBA ROLLING HILLS TOYOTA.

This order finds that defendant Rolling Hills Toyota knowingly entered into transactions in which it received cars that it knew were originally allocated to a California dealership.

Plaintiff alleges that defendant Rolling Hills Toyota made 22 unauthorized transfers of A-status vehicles on four separate days from City Toyota through Quality Auto Locators (Amd. Compl., Exh A). These transactions occurred from December 2010 through April 2011. Mr. Petro confirmed that it was his practice, when dealing with Mr. Elder at Rolling Hills Toyota, to tell him that the cars were from California (Petro Dep. 106). Additionally, Mr. Petro testified that it was his practice to give defendant the temporary serial (VIN) numbers for the vehicles that were to be transferred (Exhs. 12, 18). Both of these items of information, independently, would have informed defendant that it was receiving cars from California. Together, this establishes *prima facie* evidence that defendant negotiated a deal in which it knew it would receive cars originally allocated to a California dealership.

11

Defendant argues that, even though defendant may have known that these cars were allocated to a California dealership, jurisdiction is not proper because "there is no evidence that the vehicles at issue in this litigation were ever located in California" (Rolling Hills Mot. at 3). These cars were property owned by a California dealership in the form of an A-status vehicle. That allocated vehicle, the property of this California dealer, was purposefully diverted from California. Jurisdiction is therefore proper, at least at this stage.

### 8. HERB CHAMBERS 1168, INC., DBA HERB CHAMBERS TOYOTA.

Herb Chambers argues three grounds for dismissal: (1) lack of personal jurisdiction; (2) lack of subject-matter jurisdiction; and (3) failure to plead with particularly claims sounding in fraud.

#### A. Personal Jurisdiction.

Like its co-defendants, there is *prima facie* evidence that defendant Herb Chambers Toyota consummated transactions in which it knew or should have known it was diverting cars originally allocated to California. It was in a July 2011 A-status transfer with Chambers that plaintiff discovered unauthorized transfers were being made from its inventory. Mr. Moeller of plaintiff City Toyota placed a call to Mr. Taylor, the general manager at Chambers, demanding that he transfer the vehicles back. Mr. Taylor refused. The claim of conversion against Chambers is grounded on this act, which was done with full knowledge that he was refusing to return vehicles that were originally allocated to California (Amd. Compl ¶ 33).

Moreover, there is sufficient evidence to establish a *prima facie* case that defendant generally knew it was diverting cars that were intended for California. Mr. Taylor testified that the reason he figured this unnamed dealership was giving up its A-status vehicles in the post-tsunami inventory crunch was because "the economy was tough in California" (Taylor Dep. 137). Mr. Taylor also testified that he would not send a check for the vehicles until he confirmed that they were in his inventory, at which point he could view their selling dealership (Taylor Dep. 68). He also testified that he did not consider the transaction complete until payment was made, as the dealer agreement was "not a contract" (Taylor Dep. 67). Therefore, during the course of negotiations for the transfer of A-status cars, plaintiff has made a *prima facie* showing

12

that defendant Chambers knew it was making an agreement to divert cars that were originally allocated to California.

Drawing inferences for the plaintiff, this order finds that there is prima facie evidence that when defendant approved the transfer of the cars from plaintiff, defendant knew that it was consummating a transfer that would remove cars that were allocated to California.

### B. Subject-Matter Jurisdiction.

Defendant Herb Chambers Toyota moves to dismiss for lack of subject-matter jurisdiction, arguing that it is impossible for the amount in controversy to exceed $75,000. To dismiss for failing to meet the amount in controversy requirement, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938).

Counsel argues that as a matter of law, plaintiff may not seek damages for lost profits where fair market value will make the plaintiff whole. According to defendant, an A-status vehicle is in effect a futures contract, and its fair market value will therefore equal the present value of any future proceeds that could be gained from it. Its fair market value at the time of sale, therefore, will make plaintiff whole. According to Chambers, the fair market value of all of these transfers could not possibly exceed $20,150.

*First*, this argument fails on a mathematical basis. "Aggregation is permitted when a single plaintiff seeks to aggregate two or more of his own claims against a single defendant." *Bank of Cal. Nat'l Ass'n v. Twin Harbors Lumber Co.*, 465 F.2d 489, 491 (9th Cir. 1972). Plaintiff states a claim for conversion against defendant Herb Chambers Toyota, which allows damages in "the value of the property at the time of conversion, with the interest from that time, or, an amount sufficient to indemnify the injured for the loss which is the natural, reasonable, and proximate result of the wrongful act complained of . . . ." Cal. Civ. Code. § 3336. Plaintiff also states a claim for receiving stolen property under California Penal Code Section 496(a), which allows that "[a]ny person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages . . . and reasonable attorney's fees." These two claims, using defendant's maximum estimate, would equal $80,600 in damages

13

($20,150 plus $60,450 in treble damages). It is therefore possible for the plaintiff to meet the minimum amount in controversy requirement with respect to Herb Chambers Toyota.

*Second*, this argument fails on the merits. Defendant refers to *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 61 (Cal. Ct. App. 1985), as its authority. In that decision, after a full trial, the court found plaintiff could not recover lost profits because he had sold his business at present fair market value, which by definition included all future streams of income. At our early stage, however, this order cannot determine either whether fair market value is sufficient to make plaintiff whole, or what would constitute fair market value. At this stage, the complaint plausibly alleges damages for "the loss of each vehicle misappropriated, its lost revenues and profits on the sale of those vehicles, its lost income generated from servicing those vehicles, and its loss of current sales for purposes of future allocations" in the amount of $94,512.00 (Amd. Compl. ¶ 38).

### C. Fraud.

Defendant Herb Chambers Toyota moves to dismiss for failure to plead with particularity claims "sounding in fraud." This argument fails. Rather than pointing to statements in the complaint that are not pleaded with particularity, defendant proceeds to make legal arguments about whether or not Mercado was properly considered to be an authorized or unauthorized transferor of A-swaps. This order will not address this legal argument at this early stage.

## CONCLUSION

Based on the current record after limited discovery, plaintiffs have made a *prima facie* showing of specific personal jurisdiction in a California court with respect to each defendant. There is *prima facie* evidence that each defendant either knowingly consummated a transaction in which it received goods originally allocated to California, or acted in reckless disregard of the improper behavior which diverted the A-status cars from California. It is therefore reasonable for the defendants to be expected to be haled into a California court. For the above stated reasons, defendants' motions to dismiss are **DENIED WITHOUT PREJUDICE.** Because this order

does not rely on it, plaintiff's administrative motion to augment evidence submitted in opposition to defendants' motions to dismiss is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated: August 22, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE